**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| TIMOTHY HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:21-CV-74-HAB |
| | ) | |
| REGAL-BELOIT AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Lizard people run the world's governments. The Earth is hollow. Paul McCartney died and was replaced by a body double. Outlandish conspiracy theories all. Defendant Regal-Beloit America, Inc. ("Regal") claims that Plaintiff's age discrimination case is yet another "outlandish conspiracy theory" (ECF No. 47 at 1) and has moved for summary judgment (ECF No. 45). That motion is now fully briefed (ECF Nos. 47, 53, 59) and ready for ruling.

**I.      Evidentiary Objection**

In its reply brief in support of its motion for summary judgment, Regal moved to strike three exhibits designated by Plaintiff in opposition to the summary judgment motion: Exhibit C, a document titled "OWBPA Disclosure in Connection with the June 2019-February 2020 Business Realignment"; Exhibit D, Regal's organizational charts; and Exhibit P, a recording of a conversation. Regal argued that the exhibits were not properly authenticated, and that Plaintiff had not disclosed Exhibits D or P during discovery.

In a June 2023 Order, the Court rejected the authentication argument, noting that it "can consider unauthenticated documents on motions for summary judgment if it appears that they are capable of authentication at trial." (ECF No. 63 at 1) (citing *Remmer v. Wexford Health Sources,*

*Inc.*, 19-cv-420-NJR, 2021 WL 535542, at *4 (S.D. Ill. Feb. 12, 2021)). But the Court did order additional briefing on the disclosure issue. (*Id*. at 2). The parties have submitted the additional briefing as ordered. (ECF Nos. 64, 65).

The Court believes it has a general understanding of the relevant timeline based on the new briefs. Fact discovery closed in October 2022. Regal moved for summary judgment in February 2023. Exhibits D and P were designated by Plaintiff in opposition to the motion for summary judgment the next month. Those exhibits had not been disclosed in discovery; Exhibit P had been disclosed by a different plaintiff in a different case against Regal shortly after Regal's motion for summary judgment was filed.

Rule 26 of the Federal Rules of Civil Procedure requires a party to provide other parties with "the name and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). Rule 26 also requires a party to supplement or amend its disclosures and discovery responses if it learns that the information disclosed or the response is "incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1). To ensure compliance with these discovery requirements, Rule 37 provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or (e) . . . is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The Seventh Circuit has stated that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or

harmless." *Salgado v. Gen. Motors Corp*., 150 F.3d 735, 742 (7th Cir. 1998). But it also has stated that "[t]he determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid–Am. Tablewares, Inc. v. Mogi Trading Co., Ltd*., 100 F.3d 1353, 1363 (7th Cir. 1996). "A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co*., 170 F.3d 985, 993 (10th Cir. 1999). All the same, the Seventh Circuit has suggested that the factors below should guide the Court's discretion: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date. *See Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir. 1995).

The Court is unmoved by Defendant's complaints about the organizational charts. While Regal argues that it doesn't know "when the organizational charts were created or who provided them" to Plaintiff, it doesn't argue that the charts are inaccurate. The Court cannot imagine how an accurate portrayal of Regal's organizational structure could ever be prejudicial ***to Regal***, regardless of when it is disclosed. Plaintiff's late disclosure of Exhibit D is harmless, and the exhibit will not be stricken.

Exhibit P is a different story. As for prejudice, Plaintiff primarily argues that Regal "has had Exhibit P in its possession since February 14, 2023," when it was disclosed in discovery in *Shaw v. Regal-Beloit Am., Inc.*, Cause No. 1:21-CV-272-HAB. So, Plaintiff argues, Regal knew about the recording "for months," and cannot claim to have been ambushed or prejudiced by its designation in opposition to summary judgment. (ECF No. 64 at 6–7).

This all sounds well and good and, by the time the additional briefing was filed, it had been "months" since the recording was disclosed. But another way to say "February 14, 2023," is "eight days after Regal filed its motion for summary judgment." Even if disclosure in a different case by a different plaintiff met ***this Plaintiff's*** disclosure burden, it was unavailable to Regal at the time it moved for summary judgment.

But, of course, disclosure by a different plaintiff in a different case does not satisfy Plaintiff's burden. The purpose of initial disclosures under Rule 26(a)(1) is to put all parties on notice, at the earliest possible point in time, of all evidence and witnesses to be used in a case. Similarly, discovery seeks to help "define and clarify the issues" in a case. *Coleman v. Illinois*, Case No. 19 C 3789, 2020 WL 5752149, at *3 (N.D. Ill. Sept. 25, 2020). These purposes are defeated if Plaintiff can outsource its responsibilities to unrelated parties, *Rowe v. Shulkin*, Case No. 17-cv-9258, 2019 WL 2060951, at *2 (N.D. Ill. May 9, 2019), or even rely on publicly available information. *Martino v. Kiewitt N.M. Corp.*, 600 Fed. App'x. 908, 911 (5th Cir. 2015).

Plaintiff does point out that one of the individuals on the recording, John Kunze ("Kunze"), was designated by Plaintiff as a potential witness and was deposed by the parties. This, he claims, defeats Regal's claim that it was surprised by the designation of Exhibit P. But this strikes the Court as exactly backwards. That Kunze was a known, and expected, witness only makes any recorded statements by him more important. And Regal would have wanted such statements at the time it deposed Kunze, to say nothing of by the time it moved for summary judgment. That the recording was not disclosed until after the close of discovery, after Kunze's deposition, and after Regal moved for summary judgment is no doubt prejudicial to Regal.

As for the second and third factors, the ability to cure any prejudice and the likelihood of disruption at trial, Plaintiff focuses on that no trial is set, allowing Regal "ample time" to "prepare

to question him about the remarks he made in Exhibit P." (ECF No. 64 at 7). But, as Regal correctly notes, the exclusionary remedy in Rule 37 applies to both trials ***and motions***. And the fact that trial has not been set is irrelevant to the summary judgment proceedings. Regal had no time to question Kunze about the recording during discovery, and no time to designate evidence that would contradict the recording at summary judgment. The prejudice cannot be cured in these summary judgment proceedings.

Finally, Plaintiff fails to explain why Exhibit P was not disclosed until his summary judgment filing. Other than to say, "there was no bad faith or willfulness involved in Plaintiff's disclosure of Exhibit . . . P," (ECF No. 64 at 8), Plaintiff does not say when he came into possession of the recording, how long he had it before he filed it as part of his summary judgment briefing, or why it wasn't disclosed before then. The Court assumes, then, that no good explanation for the belated disclosure exists.

In sum, the Court does not find that the belated disclosure of Exhibit P was harmless or justified. Exclusion is, therefore, mandatory. *Salgado*, 150 F.3d at 742. Exhibit P is STRICKEN from the summary judgment record and will not be considered by the Court in ruling on Regal's motion for summary judgment.

## II.    Factual Background

### A.    *Plaintiff's Employment with Regal*

Plaintiff, who is now 61 years old, was hired by Regal in 1987. Over the course of his 33-year tenure he rose to the office of Vice President of Sales for Commercial Industrial North America, holding that position from 2018 to March 2020. Plaintiff describes his role using lots of business-speak, but it looks like he was responsible for managing a sales team of more than 50 people responsible for more than $800 million in annual sales. Plaintiff reported directly to the

President of Commercial, Scott Brown ("Brown"), and indirectly reported to the President of Industrial, Eric McGinnis ("McGinnis"). These supervisors are 63 and 52 years old, respectively.

**B.**    ***Regal Reorganizes its Corporate Structure***

Louis Pinkham ("Pinkham") became CEO of Regal in April 2019. Shortly after assuming the role, Pinkham began a push to improve Regal's performance in the market. His plan was to "partner[] new perspectives and ideas with employees' experience and capabilities." (ECF No. 46 at 2). Pinkham often referred to this as the need for "fresh talent." Regal denies that "fresh talent" has anything to do with age, instead describing it as the need for external hires and moving existing employees between divisions. But Plaintiff claims that Pinkham often talked about bringing in "younger," in addition to fresher, talent.

Key to Pinkham's improvement plan was decentralizing Regal's operations. He split the company into four autonomous "Segments." Brown, 59 at the time, was promoted to President of the Commercial Systems Segment. McGinnis, 48 at the time, was promoted to President of the Industrial Systems Segment. Kunze, 56 at the time, was promoted to President of the Climate Solutions Segment.

While the Segments generally functioned as their own businesses, responsible for their own human resources and finances, the Commercial and Industrial Systems Segments shared a sales force led by Plaintiff. This created friction between Brown and McGinnis; Brown's Segment made more money, and McGinnis felt that he did not get an equal share of Plaintiff's time. The two men also had different visions of how the sales team should be set up, leaving Plaintiff in the middle of the two visions. To resolve this conflict, Brown and McGinnis decided to decentralize the Commercial and Industrial Segments. Brown worked with Dennis Mikulecky ("Mikulecky"), now 65 years old, to structure the Commercial Segment sales organization.

6

Plaintiff's role in all this was to lead Project Young[1], initially a project to consolidate the lease and sales teams within the Commercial and Industrial Segments. But after Brown and McGinnis began their push to decentralize those Segments, Project Young shifted towards that goal. Plaintiff's role eventually evolved into helping Brown assemble proposals for sales reorganization.

Sometime during Plaintiff's work on Project Young, Plaintiff approached Kunze about the open Vice President of Sales position within the Climate Segment. Kunze responded by speaking with Brown, who asked Kunze not to consider Plaintiff until after his work on Project Young was completed. Kunze agreed. Regal ultimately hired Arlene Campbell, a woman in her 40s, for the position.

**C.      *Plaintiff's 2019 Performance Review***

Mikulecky and Brown developed concerns about Plaintiff's work on Project Young, particularly the speed with which the project was being completed. Brown believed that Plaintiff struggled with project management, organization, and keeping stakeholders informed throughout the process. Brown also had concerns with Plaintiff's performance as a sales leader, believing that Plaintiff was not running the sales organization effectively. As a result, Brown gave Plaintiff a "Needs Improvement" rating on his 2019 performance review. Brown felt that Plaintiff failed to effectively implement processes to manage a large sales organization, including incentive plans, playbooks to get new business, and develop plans for individual salespeople. Brown also noted in the review that he believed Plaintiff's "[role] is too broad in scope for his current leadership and management skills. I feel [Plaintiff] could be more successful in roles with less scope aligned with

---

[1] Regal asserts that the project was named after Neil Young, Brown's favorite singer. Plaintiff doesn't know why the project got that name.

his strengths related to the USA C&I medium and small customer base." The review suggested that Plaintiff "should shift into a role that is less broad than his current role."

Plaintiff admits that he received a "Needs Improvement" rating but questions its accuracy. Neither Mikulecky nor Brown questioned Plaintiff's performance before the 2019 performance review. And Plaintiff attributes the delays in completing Project Young to the shifting goals of Brown and McGinnis. Finally, Plaintiff notes that the 2019 performance review was complementary of his performance on Project Young, stating, "Project Young was a complex project to simplify our salesforce for customers. Tim met our objectives for budget, timing, and saving," and "[s]ignificant personnel impacts with Project Young—All reports to date indicate that Tim handle[d] these with integrity, professionalism, and respect. No compliance issues to date."

### D.   *Plaintiff's Position is Eliminated*

Brown and Plaintiff also discussed succession planning for Plaintiff's role around the time of the 2019 performance review. Brown discussed hiring "someone that can be the next Tim Harris." But Plaintiff alleges that Brown also discussed hiring "younger and fresher talent" to drive succession planning.

While Brown was not sure, by the end of 2019, whether he wanted to keep Plaintiff's position, he did believe that the role was too big for Plaintiff. Brown asked Plaintiff to draft a job description for his Vice President role that could be posted externally, and directed Mikulecky to work with a search firm to find an external candidate to take over Plaintiff's role should it be retained. Brown told Plaintiff to "start a succession planning for his position as vice president and [Brown] wanted to bring in or start recruiting a different look or a younger and fresher talent as [Plaintiff] was coming to the end of [his] career at [his] age." Mikulecky confirmed that Brown used the term "younger" when discussing succession planning and confirmed that Regal created a

program to attract younger workers. Kunze, who would later become Plaintiff's supervisor, testified that Pinkham wanted to seek out "someone younger" that he could "coach up." Plaintiff understood these statements to mean that Plaintiff would not be considered for his position given his age.

Brown ultimately decided to decentralize the Commercial Segment's sales organization, thus eliminating the need for Plaintiff's position. Regal claims that the position was eliminated, and that Plaintiff was not replaced. Individuals took over some of Plaintiff's duties, including Jared Koch ("Koch"), John Sajovic, Ted Gruhn, Mike Catania, and Romell Reddi ("Reddi"). All those individuals were over 40 years old, and three of them were over 50 years old.

Plaintiff disputes that his role was eliminated. Plaintiff believes that his job functions were transferred to the role of Senior Director of Sales Commercial Motors North America, a position occupied by Koch, an individual 15 years younger than Plaintiff. The only differences between Koch's new position and Plaintiff's old position were that Koch was not responsible for Industrial Segment sales—a small part of Plaintiff's role, and that Koch did not pick up Plaintiff's responsibility for national distribution. But Koch is the only director for North American sales for the Commercial Motors Segment, and all salespeople for that Segment report to Koch.

The parties dispute when Plaintiff's role was eliminated. Regal claims that Brown and Mikulecky told Plaintiff in late-March 2020 that his position was being eliminated effective immediately. Plaintiff, however, points to several emails and communications from April 2020 that refer to him as the current Vice President of Sales for Commercial and Industrial. At least two of those communications note an effective date of April 30, 2020, for the elimination of Plaintiff's position.

E.   *Plaintiff Seeks a New Position with Regal*

During the same late-March 2020 conversation when Plaintiff was informed his job was eliminated, Brown encouraged Plaintiff to contact Kunze for a new position in the Climate Segment. Brown explained to Plaintiff that he "need[s] to understand what's happening" with Regal because there would be "significant changes happening in the next 48 hours." Plaintiff believes that these statements implied that he could not keep up with the changes due to his age.

Brown and Plaintiff also discussed the 2019 performance review during this conversation. Brown did not want to discuss the performance review, emphasizing that Plaintiff needed to focus on the changes at Regal over the next few days. Plaintiff responded:

> Scott, it really doesn't matter. It doesn't matter. I'm disappointed. You want somebody who is a performer for 33 years never one in 33 years ever been even close to this point not at 59 years old, in 33 years, not one time, ever, into this category—you want someone to give a little bit [of] pushback on this.

Brown reiterated that he didn't believe a discussion of the performance review was worthwhile.

Over the next few weeks, Plaintiff sought out multiple positions within Regal. These included a position under Reddi, the Director of Sales for the HVAC Segment, and a director of sales role with the Power Transmission Segment. Plaintiff was told that he would not be considered for any of these roles. Some of these roles were already filled, either on a full-time or interim basis.

As part of this internal job search, Plaintiff talked with Tammy Randall ("Randall"), an HR representative, to brainstorm potential leadership opportunities within Regal. During this conversation, Randall told Plaintiff that there was a perception at Regal that Plaintiff would retire within the next two years. Plaintiff denied that this was the case, indicating that he might work another decade. But Randall responded that the perception was important, particularly when discussing talent planning with Pinkham. Plaintiff responded that a discussion of his age was a "pretty dangerous conversation," and suggested that the retirement talk was being directed at him,

not started by him. Randall replied that she was just being "candid" with Plaintiff, and that everyone knew that major changes would be coming to the Climate Segment because of anticipated retirements. Randall reported this conversation to Mikulecky.

Plaintiff later talked to Catania where they discussed the reorganization and Plaintiff's next steps. Plaintiff told Catania that he would not accept a Level 21 role with Regal. Plaintiff emphasized that if he did accept a Level 21 role, he would use it to get paid while looking for another job.

**F.    *Plaintiff Takes a Role as Key Account Manager***

Plaintiff's internal job search was fruitful: Kunze offered Plaintiff a job in the Climate Segment as a Key Account Manager, a Level 21 position. This was a take-it-or-leave-Regal offer, as Pinkham made it clear behind the scenes that if Plaintiff did not accept the job his employment with Regal would end.

Because the Key Account Manager was at a significantly lower level and pay than Plaintiff's Vice President position, Regal had internal discussions about potential legal action by Plaintiff. Cheryl Lewis ("Lewis") "coached" Pinkham on the possibility that Plaintiff would bring a claim for constructive discharge based on age discrimination. Mikulecky similarly floated maintaining Plaintiff at his Vice President's salary, noting that if Plaintiff was paid the same it would be "deemed to be pretty much a comparable job." Regal sought to insulate itself from legal action by having Randall and Lewis draft an offer that "clearly explained that [Plaintiff's] position was eliminated and there was another opportunity he could choose to select."

Beyond legal concerns, Regal was concerned that Plaintiff would not be engaged in a new, diminished role. Kunze asked Plaintiff not to accept the role if Plaintiff was not fully on-board. Plaintiff assured Kunze that, if he accepted the job, he would be fully committed. Kunze relayed

Plaintiff's promised enthusiasm to Pinkham, which Regal now describes as Kunze going "to bat for [Plaintiff] with Pinkham" in offering him the Key Account Manager Role.

Plaintiff eventually accepted the position in April 2020, with a start date of May 1. But he quickly discovered that it was a "sham." Plaintiff describes the job as a "low-level territory account job, which covered historically very low-performing accounts for the company." He also describes the job as "meaningless" with a "significant cut in pay" and "absolutely no scope for success." Plaintiff became concerned not only for his current compensation but also his retirement benefits, as Regal based those benefits on his five most recent years of pay as of the date of retirement.

**G.    *Plaintiff Leaves Regal for a New Job***

By the end of May, Plaintiff had been offered and accepted a position with HTI Technologies. Plaintiff told Kunze in early June that he would be retiring with an effective date in early July. Regal accepted Plaintiff's retirement. Regal did conclude, however, that HTI was a direct competitor, so it shut off Plaintiff's access to Regal's systems and Plaintiff's company-issued cell phone. Yet Plaintiff remained cordial with both Kunze and Randall, emailing them that "Regal has been my life and has been very good to me."

Kunze was not feeling so magnanimous. He "felt burned" that Plaintiff was leaving Regal so soon after Kunze had "gone to bat" for Plaintiff with Pinkham. Kunze was forced to apologize to Pinkham for not listening when Pinkham was concerned that Plaintiff would not be happy in the Key Account Manager role.

As part of his retirement from Regal, Plaintiff elected to invoke a Regal policy that allowed retiring employees to accelerate the vesting of stock options. Regal's policy required employees seeking to accelerate vesting to be at least 58 years old, to have been with the company for 10 years, and to meet performance expectations for the year they seek to accelerate. Plaintiff sought

to accelerate vesting of his 2017 through 2019 stock options. Regal granted the accelerated vesting for 2017 and 2018 but denied the 2019 acceleration based on the 2019 performance review.

The parties dispute how the 2019 performance review should have affected the acceleration decision. Regal claims that the performance reviews affected the same year acceleration; i.e., the 2019 "needs improvement" rating means that 2019 vesting could not accelerate. Plaintiff claims that stock options are awarded for the prior year's performance, which would mean that the 2019 performance review would only be relevant for 2020 stock options.

Plaintiff points to reasons other than the 2019 performance review for the negative acceleration decision. In a June 2020 email, April Christenson, Regal's Vice President of Global Compensation and Benefits, wrote that, based on her understanding of the facts, she would not accelerate vesting based on "his performance and the circumstances surrounding his resignation/retirement." In another email sent the same day, Jennifer Glenn, Human Resource Manager for the Climate Segment, wrote to Randall to express her concerns over the decision. Glenn noted that they had never denied acceleration "with anyone else, particularly someone who is retiring with notice." Glenn believed that the decision to deny acceleration was "an emotional reaction instead of a business reaction."

## III.   Legal Discussion

### A.   *Summary Judgment Standard*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving

party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists cannot create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court is not "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

**B.**      ***Discrimination under the ADEA***

Plaintiff's first claim alleges that Regal discriminated against him because of his age. The ADEA makes it unlawful for employers to take adverse employment actions against employees who are 40 years old or older because of their age. 29 U.S.C. §§ 623(a), 631(a). Liability in a disparate treatment case "depends on whether the protected trait (under the ADEA, age) *actually motivated* the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (emphasis added). Thus, to prevail on a disparate treatment claim under the ADEA, a plaintiff must "prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

14

In *Ortiz v. Werner Enterprises*, 834 F.3d 760, 765 (7th Cir. 2016), the Seventh Circuit clarified that the proper way to assess a disparate treatment claim at the summary judgment stage is to ask whether the admissible evidence, considered as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." The familiar *McDonnell Douglas* burden-shifting framework still remains a valid method of organizing and assessing circumstantial evidence of employment discrimination. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). To make out a prima facie case of discrimination under the *McDonnell Douglas* framework, Plaintiff must offer evidence showing that (1) he is a member of a protected class, (2) he was meeting the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees outside his protected class were treated more favorably (or, in an age discrimination case, that he was replaced by someone substantially younger). *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). Then, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for its actions. *Carson v. Lake County*, 865 F.3d 526, 533 (7th Cir. 2017). If the employer provides such an explanation, the burden shifts back to the plaintiff to submit evidence that the explanation is pretextual. *Id*. No matter if the plaintiff chooses to proceed under the *McDonnell Douglas* method of proof, "at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of her age." *Id*.

**1.**   *Disparate Impact*

Plaintiff's complaint alleges only disparate treatment under the ADEA, but his brief references a claim for disparate impact. (ECF No. 53 at 17). The Supreme Court has held that

disparate impact claims are also cognizable under the ADEA. *See Smith v. City of Jackson*, 544 U.S. 228, 240 (2005). "Claims of disparate treatment may be distinguished from claims that stress 'disparate impact'" in that the "latter involve employment practices that are facially neutral in their treatment of different groups but that . . . fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

Disparate impact is a "poor fit" for Plaintiff's ADEA claim. *Carson v. Lake City, Ind.*, 865 F.3d 526, 536 (7th Cir. 2017). Plaintiff's entire theory is that Regal had a policy to hire "younger" talent, thereby pushing out older employees like him. But to state a claim for disparate impact, plaintiffs would have to show that a "specific, *facially neutral* employment practice caused a significantly disproportionate adverse impact based on age." *Id.*, citing *Karlo v. Pittsburgh Glass Works*, LLC, 849 F.3d 61, 68 (3d Cir. 2017) (emphasis added). There's nothing facially neutral about the policy Plaintiff alleges. If he has a claim, it is not for disparate impact.

A disparate impact claim would also require "statistical evidence that the policy caused a significant age-based disparity." *Id.* Plaintiff believes he has done that, as he points to evidence that "80+% of employees selected for termination were over 40 and 65+% of employees selected for termination were over 50." (ECF No. 53 at 22). Superficially impressive stats, but as the saying goes, there are three kinds of lies: lies, damned lies, and statistics.

Without greater context, Plaintiff's statistical evidence does nothing to show age-based disparity. Say 90% of Regal's pre-reorganization workforce was over 40, and 70% over 50. Under those facts, Regal's reorganization disproportionately *benefitted* older workers. That conclusion changes if the over-40 workforce was only 50% of all Regal employees, and the over-50 20%, but Plaintiff never tells the Court these important baseline numbers. Simply telling the Court that more

over-40 than under-40 workers were fired cannot show a disparate impact. *See Jackson v. City and Cty. of Denver*, 628 F. Supp. 2d 1275, 1303 (D. Colo. 2008) (evidence that 77% of impacted employees were 40 or older could not show disparate impact without evidence of the age of all employees). The Court finds no basis for a disparate impact claim, and Regal is entitled to summary judgment on that claim.

**2.**     *Disparate Treatment*

Before getting to the merits of Plaintiff's disparate treatment claim, first a word about labels. Plaintiff and Regal both discuss "direct" and "indirect" evidence of discrimination in their briefs. (ECF Nos. 53 at 17-18; 62-1 at 5-7). Following *Ortiz*, evidence can no longer "be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently. Instead, all evidence belongs in a single pile that must be evaluated as a whole." *Ortiz*, 834 F.3d at 766. If the parties ask the Court to evaluate Plaintiff's evidence differently based on outdated labels, the Court declines.

Having reviewed all the admissible evidence, the Court concludes that Plaintiff has designated enough evidence for a reasonable jury to conclude that Plaintiff suffered an adverse employment action because of his age. The project that prompted the elimination of Plaintiff's position was called "Project Young." While Regal has an innocent explanation for this name, it is consistent with the rest of Plaintiff's evidence. Plaintiff heard Pinkham many times direct the hiring of "younger talent." Brown, Mikulecky, and Kunze also discussed with Plaintiff the need to bring in "younger and fresher talent." These are direct statements from Regal's decisionmakers directing that younger people be given priority over older people in hiring and promotion decisions.

On the back of these statements, the rest of the evidence takes on a markedly suspicious tone. Take Plaintiff's 2019 performance evaluation. Regal asserts that Plaintiff was assigned a "needs improvement" rating because Project Young was running behind, and Plaintiff struggled with project management, organization, and keeping stakeholders informed throughout the process. But within the review, Brown wrote, "Project Young was a complex project to simplify our salesforce for customers. Tim met out objectives for budget, timing, and saving," and "[s]ignificant personnel impacts with Project Young—All reports to date indicate that Tim handle[d] these with integrity, professionalism, and respect. No compliance issues to date." Which is it? Was Plaintiff slow and non-responsive in implementation of Project Young, or did he meet all objectives with integrity, professionalism, and respect?

Questions exist regarding whether, and when, Plaintiff's role was eliminated. Regal asserts that Plaintiff's job was eliminated as part of corporate restructuring, and that the elimination was effective at the end of March 2020. Plaintiff, pointing to the similarity in responsibilities, argues that Koch's Senior Director of Sales Commercial Motors North America position was the same as his Vice President of Sales for Commercial Industrial North America. He also points to communications from Regal showing that the company viewed him as retaining his VP position until the end of April 2020. Genuine issues of material fact, both.

The post-elimination discussions, while facially neutral, also seem strange considering the push for younger employees. True, Brown did not say Plaintiff was too old to understand what was going on when discussing the "significant changes happening in the next 48 hours," but the repeated emphasis on the speed with which corporate changes would be made, stated to a corporate VP who had authored some of those changes, is odd. So, too, are Randall's repeated references to Plaintiff's suspected retirement plans. These statements can be unrelated to age discrimination, but

18

a reasonable jury could find otherwise when they are made by executives in a company that is seeking "younger" workers.

Regal makes several arguments attacking the legal sufficiency of Plaintiff's evidence, but the Court finds none availing. Primarily, Regal claims that this Court should completely discount the idea that anyone at Regal wanted to bring in "younger" employees, noting that the evidence supporting this fact is confined to Plaintiff's "self-serving statements." (*See* ECF No. 47 at 9). "Self-serving" is not the panacea Regal seems to believe it is. "Provided that the evidence meets the usual requirements for evidence presented on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial—a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts." *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). Plaintiff's testimony here, that he heard the relevant parties discussing the need for "younger" workers, fits the Seventh Circuit's direction.

Regal also tries to downplay the many statements referencing age as "stray remarks." *See Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 813 (7th Cir. 2007) ("stray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment"). But "stray" means "occurring at random or sporadically,"[2] and that's not what these statements were. Plaintiff has identified four executives at Regal, including its CEO, that discussed hiring "younger" workers. Plaintiff claims that he often heard Pinkham make these statements. Accepting Plaintiff's version of events as true, as the Court must, the statements here were regular, frequent, and enough to defeat summary judgment.

---

[2] https://www.merriam-webster.com/dictionary/stray

Plaintiff may not prevail at trial. A jury may believe that Plaintiff's VP position was eliminated as part of a corporate reorganization, and that Regal's representatives never said the things Plaintiff claims. But at this point, taking Plaintiff's factual representations as true, the Court finds that the same jury could find to the contrary. Regal's motion for summary judgment as to Plaintiff's disparate treatment claim, then, must be denied.

**C.       *Failure-to-Hire***

Failure-to-hire claims under the ADEA are evaluated just like a disparate treatment claim; i.e., the *McDonnell Douglas* approach is available, but the *Ortiz* holistic approach to evidence must control. *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021). The difference is in the prima facie case: for a failure-to-hire claim, a plaintiff must show, "(1) []he was a member of a protected class; (2) []he applied for and was qualified for the position sought; (3) []he was rejected for the position; and (4) the employer [hired] someone outside the protected group who was not better qualified than the plaintiff." *Id.*

While Plaintiff references four positions he claims support his failure-to-hire claim, he discusses only two. The first is the Director of Sales for the HVAC Segment. Both parties agree that this position was filled when Plaintiff expressed his interest. But Plaintiff stresses that it was filled on an interim basis, and that he should have been considered for the role when the interim role expired. The Court finds two problems with Plaintiff's argument, one factual and one legal.

Legally, the Court finds no support for the line Plaintiff draws. Plaintiff cites no caselaw for the proposition that a role filled on an interim basis is still "open" under the ADEA, and the Court can find none. It seems, then, that the Director of Sales for HVAC was not an open position when Plaintiff sought it out. It cannot, then, be a position that establishes a failure-to-hire claim.

Even if the Court accepted Plaintiff's interim-based argument, he does not tell the Court when the position finally came open. Remember, Plaintiff had left Regal by the middle of 2020. And there is no evidence that he ever sought employment with Regal after he left. So, if the Director of Sales for HVAC came open after the middle of 2020, it would be hard to see how Plaintiff could have sought it out. Because this key information was not provided by Plaintiff, the Director of Sales for HVAC is not a position on which he can base his failure-to-hire claim.

The Court finds that the second position, Senior Director of Sales Commercial Motors North America, fails for a similar reason. As Regal notes, this position was never open; it was always filled by Koch. And Plaintiff concedes this point in his own brief, noting that Koch absorbed Plaintiff's former job duties as part of the Senior Director of Sales Commercial Motors North America role. (ECF No. 53 at 21). There does not appear, then, to have been a position for Plaintiff to be hired into. Koch's absorption of Plaintiff's duties may be relevant to Plaintiff's disparate treatment claim, but it does not support a failure-to-hire claim. With Plaintiff having discussed no open position that could support a failure-to-hire claim, Regal is entitled to summary on that issue.

**D.**   *Retaliation*

Finally, Plaintiff alleges that Regal retaliated against him for complaining about age discrimination. To succeed on a retaliation claim under ADEA, Plaintiff must show that: "(1) [he] engaged in statutorily protected activity; (2) [he] suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action." *Horwitz v. Board of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 612 (7th Cir. 2001).

Plaintiff asserts two adverse employment actions: the termination of his VP position and his subsequent demotion, and the refusal to accelerate the vesting of his stock options. The Court will address each in turn.

The Court finds a timing problem for the first employment action. Although the parties dispute what Plaintiff did that could constitute "statutorily protected activity," it started, at the earliest, during the conversation when Plaintiff was informed that his position was being terminated. Plaintiff states that he "first raised concerns of age discrimination in the conversation during which Brown and Mikulecky told him his position was being eliminated." (ECF No. 53 at 25). But this activity necessarily occurred after it was decided that his position would be terminated. Because statutorily protected activity after an adverse employment action cannot support a claim for retaliation, this part of Plaintiff's claim fails. *Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655, 658 (7th Cir. 2012) (EEOC charge filed five months after termination cannot support a claim for ADEA retaliation).

The Court has no such concerns with the vesting issue. Regal defends this part of the claim in two ways. First, it claims that Plaintiff "cannot establish **any** decisionmaker knew he had ever complained of age discrimination." (ECF No. 62-1 at 15) (original emphasis). The Court cannot agree. Plaintiff directly discussed his concerns about the apparent age-related nature of his termination with Brown and Mikulecky when they told Plaintiff his position was being eliminated. And it is undisputed that Randall reported the conversation she had with Plaintiff, in which Plaintiff warned that discussing his age was a "pretty dangerous decision," to Mikulecky. Both conversations meet the low burden for protected activity, as Plaintiff did more than "complain in general terms." *Smith*, 674 F.3d at 658. At least two senior decisionmakers were aware of Plaintiff's complaints, contrary to Regal's blanket assertion.

Regal next claims that the decision was made only because of his 2019 performance review, and therefore Plaintiff's activity has no causal connection. But Regal's own communications suggest otherwise. April Christenson, Regal's Vice President of Global Compensation and Benefits, wrote that, based on her understanding of the facts, she would not accelerate vesting based on "his performance and the circumstances surrounding his resignation/retirement." In another email sent the same day, Jennifer Glenn, Human Resource Manager for the Climate Segment, wrote to Randall to express her concerns over the decision. Glenn noted that they had never denied acceleration "with anyone else, particularly someone who is retiring with notice." Glenn believed that the decision to deny acceleration was "an emotional reaction instead of a business reaction." These are exactly the kind of shifting or inconsistent explanations that point to pretext. *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 938 (7th Cir. 2022). At the very least, they are enough for a jury to decide whether Regal's explanations warrant belief. For this reason, the retaliation claim will be allowed to proceed on the vesting issue.

## IV.     Conclusion

For these reasons, Regal's motion for summary judgment (ECF No. 45) is GRANTED on Plaintiff's ADEA disparate impact and failure-to-hire claims, and on Plaintiff's ADEA retaliation claim for his alleged termination and demotion. The motion is DENIED in all other respects.

SO ORDERED on September 27, 2023.

 s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT

23